May it please the court, Mary Massaran on behalf of the defendants' appellants, I would like to reserve four minutes for rebuttal. Very well. Thank you. A reversal is required here because the record shows that the police officer and dispatcher's conduct did not amount to deliberate indifference to Katie Kindl's serious medical needs, where she exhibited none of the severe symptoms normally associated with delirium tremors. They responded to her the only time she gestured for help, and the video entirely discredits contrary testimony from an inmate. I know there's been a great deal of question about the jurisdiction, and this court has of the interlocutory jurisdiction, but I don't believe that this case is really problematic in that regard because the video is very clear. It shows exactly what Katie Kindl was doing, and it does discredit the notion that she was banging on the window at length and pleading for help. It's entirely consistent with the testimony of all of those who were in the lockup facility, which was to say she was acting normally. She was walking around the cell, she was sitting on the bed, and then for an extended period of time she appeared to be sleeping, which is not unusual during the night in a jail lockup for someone who has been taken into custody, particularly where they may have been drinking before they were taken into custody. The standard for showing a constitutional violation here requires both an objective and a subjective showing. The plaintiff has to show the condition is sufficiently serious. Counsel, pardon me, but you seem to get right to the heart of it when you say that the tape is clear evidence under Scott v. Harris, but aren't there portions of the tape that are trying to get attention? Like 856 is shouting out the window, and 1028, she stands in front of the window appearing to talk to him, and then when she starts shaking, she's shaking for 30 seconds. I mean, is that not a fair characterization of what's going on on the tape? I don't believe so. I think when you look at the tape. We just have to look at the tape, then, I guess. Correct. I mean, I've looked at it. It's hard to view all those little screens, but I've looked at it more than once, and certainly the court has access to it. If we look at it and we see that it could be that she was trying to gain attention by hand movements and what could be yelling, then that would be enough. That would be enough not necessarily to get to a jury, but to get past the sort of blatantly objective standard of Scott v. Harris. I don't believe so. I believe the court has jurisdiction, and this is the reason why. When you look at that tape, what it discredits is the notion that the officers were subjectively aware and drew an inference and ignored the inference that there was a serious medical need. What we have is a showing that at one point the officers spoke with Lisa Kendall. She at that time said, I may be experiencing delirium tremors. They said, what do you want? She said, well, just keep an eye on me. She did not request medical care. That's apparent, nor did she when she was admitted to the facility. What we have from the tape, as well as from the overwhelming evidence, deposition evidence and documentary evidence, is a circumstance in which the officers respond the time that they observe a need, lots of time where she is not foaming at the mouth, she doesn't appear to be hallucinating, she's able to walk around the cell, all of these things that are consistent with someone who is not experiencing delirium tremors or a serious medical need. In that circumstance, it seems to me the court has jurisdiction and a reversal is in order. Do we have a pathology report, cause of death? Did somebody do an autopsy on this? There is an autopsy and the record has also expert medical evidence. The record shows that she died of alcohol withdrawal. The time of death is not clear. But is that the autopsy shows that or what? I don't want to misspeak and I apologize for not being entirely certain. I think it was the autopsy, but I'm not 100% sure of that. Alcohol withdrawal. Correct. Correct. Of course you can have alcohol withdrawal and need immediate medical attention and not necessarily have delirium tremens. You don't have to have delirium tremens to have symptoms of alcohol withdrawal. So she may have been in need of medical treatment without this delirium, without the obvious delirium tremens situation. That's entirely true and that's a part of why we think there was not a constitutional violation and that qualified immunity would apply in any event because these are lay people. They're not held to the standard of a doctor who might appreciate the relative severity. What they're observing is nothing that is indicating a serious medical need and this court has held on prior occasions. I'm not suggesting she didn't exhibit a serious medical need just because she wasn't having delirium tremens. She still could have exhibited that and of course officers were told at the outset when she came into the facility that she was undergoing alcohol withdrawal and it's uncontested that she wasn't provided any medical treatment. I think it's important to differentiate. The use of the term alcohol withdrawal and delirium tremors throughout the record, they're used very much interchangeably. They're not used in a technical way by the various witnesses. And that is... You've been correct. I agree with that. Well, but delirium tremens is extreme alcohol withdrawal, right? I'll accept that. That's what the dictionary says. I'll accept that. Well, doesn't that mean it's an extreme version of the other? It's not like they're different. Well, this court has... You've got alcohol withdrawal and if it's really bad, it may be delirium tremens. This court has recognized that there is a distinction and certainly the dictionary is calling... But it's not a distinction in kind. It's not like diabetes versus polio. I mean... But let me try to explain the point I'm making, perhaps not as clearly as I'd like to. And that is, taking what you have said, Judge Rogers, certainly respiratory failure is an extreme form of something that you can start to have with a common cold. But a lay person looking at someone with the symptoms of a common cold or runny nose or whatever is not going to say, oh, that person is experiencing a serious medical need. I better call an ambulance or bring a doctor. They aren't going to observe that at all. And in this case, you have lay people in the lockup facility who are not doctors who did not appreciate that alcohol withdrawal could be fatal and who are observing symptoms that do not appear to a lay person to be obvious of a serious risk of substantial harm and even death. And I think that's very significant to the analysis of the proper outcome in this case. Of course, there's also an issue of whether there was a duty to assess her medically after. She did say she was having alcohol withdrawal, and she did exhibit a lot of severe symptoms. And she was never looked at or assessed by any medical personnel. You yourself have said that the jail personnel were not medically qualified at all in these circumstances. They were not medically qualified to do an assessment. They uniformly stated, and this is not disputed, that had she asked for medical care, they would have called medical care, and that was their practice and policy, and that was uniformly stated by all of the city defendants and witnesses. What they said was she said, I might be experiencing alcohol withdrawal or delirium tremor. But they said, Are you now? She said, No. They said, What do you want? She said, Keep an eye on me. She never requested a medical assessment, nor did she ever say she was experiencing serious symptoms at the moment of a conversation. And I don't believe that's disputed in the record. Counsel, if you accept that on the limited nature of review, we have to go with the facts that the district court said there was a genuine dispute with respect to those facts, except to the extent that they're contradicted by completely objective evidence along the lines of Scott v. Harris, right? That's the law, right? Well, I would agree with that with a couple of qualifiers. Okay. I think that's the law. And in light of that, if you look at what the district court said, the district court said, this is on page 14 of the opinion, Viewing the evidence in the light most favorable to plaintiff, by crediting the testimony of the inmates and discounting that of the defendants themselves, a jury could find, and then it says what a jury could find. Now, we may disagree with that and say a jury couldn't find that, but under Johnson, we've got to go with what the judge says a jury could find, unless there's this subjective evidence that it's just blatantly inconsistent. It says, Harriman and Moschelli were aware at the beginning of their shift that the decedent had stated she might be experiencing alcohol withdrawal. The decedent informed them shortly thereafter that she may soon be experiencing delirium tremens. For a period of perhaps two hours, she showed signs of distress, urinating on herself, moaning, crying, screaming, yelling, waving at the camera, pleading for help, exhibiting a shocked expression and sick appearance. That's what he finds that there's enough evidence of to get to a jury. And the defendants nonetheless took no action. Now, you could argue that that was not a good determination of what's in the record, but under the more extreme limits that reflect what was going on in Scott v. Harris, what is there objectively in the evidence which contradicts and makes those statements wrong? Or on the alternative, are you saying with those statements there hasn't been a violation of clearly established rights? Which of those two arguments are you making? And if the former, what is the basis for the argument? Let me come at that two different ways, and I see that I'm running into my rebuttal time, so I'll try to be brief about this. The first way is to say this. The district court is entitled to say what the district court thinks the facts are. And under the jurisdictional limits that I know this court has recognized on a number of occasions, that may pose a problem. However, what the district court is doing there is crediting the testimony of two inmates. And I have two responses to why I don't think that is fatal to my position and why I continue to think there's jurisdiction and a reversal is in order. The first is that the district court is not merely crediting the testimony, but then is taking a step further and assuming that this shows that these officers saw the serious conduct that put them on notice of a serious risk and drew an inference and deliberately disregarded it. And I don't believe there's any evidence to refute their testimony. To the contrary. Secondly, this- What about this language that I'm-you're saying that language is wrong or are you saying that it doesn't arise to the level of or sink to the level of a constitutional violation? I'm saying that language- What I read is just purely facts. I mean, there's no law there. I'm arguing both of those things. Well, with respect to the factual one- Yes. Aren't you bound by this unless there's something in the record that blatantly contradicts it? I am bound to the facts unless there's something in the record that blatantly contradicts it. Does something in the record blatantly contradict these? The video does because the video shows and the parties agree that the officers spoke with her at 11 o'clock. So these examples that you were referencing and that the district court focused on in terms of her gesturing for help came ahead of their conversation with her. And that's significant. As for two hours, she did the following thing. She urinated on herself, moaned, cried, screamed, yelled, waved, pleaded, and exhibited a shocked expression and sick appearance. Does the objective record blatantly contradict that? It does. What the objective record shows is that she did go to the window, she beckoned for help, and that at approximately 11 o'clock the officers spoke with her, turned the audio on so they could better monitor her, and at that time she told them, I'm not experiencing those symptoms now, but I might be. Please keep an eye on me. And that is- Absolutely is on the record. I thought it was on, is it an audio tape or a video tape? There is a video tape, but the officers turned the audio of the- 11 o'clock? Their equipment on so that they could hear, so that they could hear after that point better. After which point? After they spoke with her. She said, I want you to keep an eye on me. One of the officers said, I turned the tape so that I could hear her. The microphone, the tape. Can I listen to that? I don't believe so. I could not hear any sound. It's not blatantly contradicting, is it? What is? I'm not apparently being clear. The tape shows- If he says she was moaning and you have an audio tape where she's not moaning, that's a blatant contradiction. Right. If you have her saying she was moaning or someone saying she was moaning and a silent tape, but the policeman says, I didn't hear moaning, that's not blatant anymore. That's just a contradiction. The point I'm trying to make has to do with the timing. The parties agree that the conversation with her happened at 11, which is after the video shows her beckoning and asking for help. And on those facts, it seems to me undisputed and indisputable that the officers responded to her beckoning. She said, I'm not experiencing those symptoms now. The officer said with respect to urinating, it is not uncommon for inmates to urinate on themselves. It happens, and it's not a pleasant thing. There's nothing they can do about it. They did not interpret that as symptomatic of a serious medical condition. I see you're out of time, but if I understand you, you say these things are true, but the judge just doesn't mention that afterwards she said don't worry about it. Correct. Okay, thank you. One final thing. I know you're out of time. We're just on a procedural point. Why did you include in the appeal the denial of the summary judgment? We're here on this interlocutory qualified immunity, and you're usually not entitled to throw in a summary judgment issue on this kind of appeal. Why did you do that? Well, the state court claims were also raised, and in support of jurisdiction on those claims, we cited, I think, the case of Bennett. I can get the full cite, but it's in the briefs. In that case, this court said in diversity or pendent state law claims, this court would look to the state immunity law to see if the immunity would be immediately appealable. And I think it's important to note that under this. Without an appeal of the summary judgment in its own right, I just didn't understand why you did it that way. But thank you. I know you've really run over, so I won't hold you. You'll have your full rebuttal time. Thank you. Good morning. Morning. Let me please the court. I'm Don Fulkerson. I represent the plaintiff, Apolli, the estate of Lisa Kindle. Let's do some housekeeping, and let me just answer some of the questions. Let me start, Judge Sirhiner. You asked the question about was there an autopsy. Yes, Your Honor, there was. That's at record 33-9. And the autopsy concluded that Lisa Kindle died of acute alcohol withdrawal, and that's at pagesó Go ahead, Judge. I'll tell you what my problem is. It's easy to look at your case when you know the result. Sure. But when you start to look at those tapes and look at it piecemeal, it looks like a drunk. And if the police have to put every drunk in jail into the hospital, those people that are really ill will never get in the hospital. I mean, drunks cry. I've seen them. Drunks moan. I've seen them. Maybe this is giving way to my misspent youth, and maybe the FBI made a mistake, but I've seen them moan. At least you qualified that you saw that intern while you worked with the FBI. I have seen people urinating on themselves. All of those things are what drunks do when they're drunk. And when I look at this, other than a brief shake and a couple of others, it doesn't look to me like it's one thing to say, okay, we know she died of this, then let's fit the symptoms to what she died of. But it's another thing to see the symptom and say that should tell you that this is a serious medical need. That's where my problem is. Let me respond, Judge. She wasn't drunk. I mean, if this was the defendant's site, numerous cases involving detainees who were intoxicated. She didn't blow anything? She blew well under the limit. She did have a mild amount of blood alcohol. It was 0.53, and that was approximately 12 hours. If this was an alcoholic, she was essentially sober when she was arrested. This was before she was arrested. The blood draw? The blood draw was at 7.30 a.m. on July 12, 2010, during her interview with the probation officer. When she was booked an hour or two later, she was sober, and there was never any indication that she had any intoxication problem. So I would agree with you, Your Honor, that as an appellate court, you want to look to the policy and you don't want to put an undue burden on public safety officers to make their job impossible. But she was not drunk. She was arrested for violating her probation, but she was not intoxicated at any time, either when she was violated two hours later when she was booked at the City of Berkeley Police Department. That was in the morning, and these incidents occurred starting approximately 90 minutes before 8 o'clock up until the time she suffered her 40-second seizure at 11.54 p.m. So this was not a person that any of the officers could confuse with someone who was wildly intoxicated and drunk and that somehow her symptoms could have been confusing to them. If that had been the case, I could understand your argument, Judge. Maybe the seizure then could have been epileptic. Okay, well, let's get to that. But let's get to the symptoms because the argument has been made here, and again, Your Honor, I'm very satisfied with the court's awareness of the case, and you're focusing on really this is just an issue, does Scott apply? Does Scott v. Harris apply? Because their argument has morphed into that. Their argument in the trial court was this is what Harriman says, this is what Michelli says, we should take it as gospel. That's really what they argued in their first brief, but in their reply brief they say we're relying really on Scott v. Harris and we're relying on the videotape. Well, the videotape does not blatantly contradict objectively the claim that she was not only visibly displaying symptoms of severe alcohol withdrawal with the DTs, but that she did request help. I want to point out. Does the videotape contradict any statement that after midnight there was anything? Absolutely. I'm not going to argue about anything occurring after midnight. I think the videotape would blatantly contradict assertions. She says, just to move it along a little bit, she says that there's something that, if not contradicting these symptoms, indicates that she orally said I'm fine after these cysts. It's just not on there? No, Your Honor. The videotape is without audio. There's no audio whatsoever. And so what you have is you have two accounts of what Lisa Kendall was saying in the jail. You have the account of the prisoner, the detainee next door, Mr. McClanahan, who said she was moaning, she was crying out for help, she was pleading, she was begging help, she was saying help me, and then you have the two officers. Now, before I get to the videotape and I want to discuss the videotape, I just want to point out that, first of all, this incident did not occur, the conversation she had with the defendants did not occur at 11 o'clock, as Ms. Masseron says. It occurred at 8 o'clock, and I would just refer the Court to page ID 1741, footnote 3, of Judge Friedman's opinion and order. He just says it's uncontested that although Harriman and Michelli say that it occurred at 11, it actually occurred around 8 o'clock. And the videotape shows that it occurred around 8 o'clock. So we have this confrontation in this discussion, this conversation, with the defendants at approximately 8 o'clock, just after 8 o'clock p.m., not at 11. That is undisputed, actually. Now, the videotape confirms, either confirms or does not blatantly contradict, everything that detainee McClanahan testified to. It is, again, there's no audio, so we don't know what was been saying, but you can see several times, and if you want, I have the times and the seconds, if you want me to go through them, but I have very little time. You can see her talking. You can see what appears to be her yelling or shouting. You see her up and down, wandering aimlessly, sitting down, getting up, sitting down, getting up, shaking her hair. She does not appear in any way to be someone who, as the defendants claim, was fine, wasn't exhibiting any symptoms. McClanahan says she looked sick. She was in shock. She was clammy. The videotape doesn't in any way contradict that. And so let me get to what happened at 8 o'clock, because this is very important. Now, according to the defendant's reply brief, and by the way, that four-page chart in the defendant's reply brief, that's not in the record. That is their self-serving summary of what they claim is shown in the videotapes. I looked at the videotapes. Pardon me, Your Honor? I looked at the videotapes. Well, let me just go through a couple points I think are crucial. According to the defendants, she knocked once on the window. That's their statement in their reply brief. That's not true. Lisa Kendall Ashley repeatedly pounded on the window for help before the officers responded to her. She pounded on the window at 8.02 and 48 seconds, 8.03 and 9 seconds, 8.04 and 5 seconds, and then 8.04 and 41 seconds. Until she finally got the attention of McClanahan and Michelli. Now, in Officer Crum's statement, I'm sorry, in Officer Crum's October 15, 2010, investigation report, and this is at record 33-5, and I'm reading from page 1321, he says, and I quote, at approximately 2300, but we know it was 8 o'clock because that's undisputed, Kendall advised Harriman and Michelli she would like to be watched, as she feared she was having symptoms of the DT's, present tense. And then he later says in the same report, Michelli told him and used the present tense, she was having the DT's symptoms. Now, Sergeant Crum files an affidavit that the defendants attached, and this is record 38-5, where he says, look, it was just a typographical error in my report. I didn't mean to say that she was experiencing the DT's in the present tense. I meant to say she only was afraid that she might experience it in the future. That's a jury question, and the tape does not blatantly contradict this account. This is a contemporaneous account by the officers themselves that itself creates a fact question. I'm still confused. If I'm a police officer and somebody comes in and says, well, look, I may be experiencing the DT's now, is your argument then that a reasonable police officer would call medical people in at that? Yes. Just on her saying. Can I tell you why? Yeah. Okay. We're looking at the record in this case. Now, perhaps in another case with other facts, maybe, but in this case it is undisputed that according to Sergeant Crum's report, this is at page 1330, that the DT's are an emergency medical condition and medical treatment should be immediately provided for all individuals at risk. In his deposition he concedes, and this is at pages, this is record 2920, pages 662, 663, 669, and 70. These were not mere laypeoples. So Ms. Masterman's argument that these were people just off the street, Your Honors, cut them a break, they don't know what they're doing, they're just laypeople. That is not the record in this case. Sergeant Crum admitted in his deposition, we train our officers as medical first responders. Now, we've got McClanahan, who's a complete tyro. When she first gets there with her alleged DT's, she doesn't do it. There's no sign of anything. Not in the morning. That's correct. So, presumably, a reasonable officer would say, well, she said she's having DT's, there's nothing wrong with her. She didn't say she was having the DT's in the morning, Your Honor. Well, you got into this whether she said it presently or... She said it presently at 8 o'clock in the evening, after she'd been in the lockup all day. That's when she said it. She didn't say, I was having the DT's at 9 in the morning. She said, hey, look, I have a history of going through the DT's. I want you to know that. That's undisputed. Everyone says that except Harriman, who claims I was never told that. She had a history of going, none of which killed her. None of the past... We don't know whether she got prompt medical treatment, for example. We don't know that. You do. Or should. That's not germane to the issue here, Your Honor. I just want to... I'm just trying to... I understand how you feel about this case, but we have to evaluate the... I'm just trying to... I'm sorry, I'm interrupting you. Forgive me. Yes, you did. Go ahead. I'm captivated. Go ahead. Okay. Not to interrupt your train of thought, but could you furnish us with the videotaped times by Rule 28 letter or by just a supplemental letter period? And if there's anything you say that's incorrect, I'm sure your opposing counsel can respond and point that out. But could you give us a letter showing the times you think are relevant? I will.  Thank you, Your Honor. I will. Let me just say again, not only does Sergeant Crum say we train them as medical first responders, but he says this was the policy at the time of the Berkeley Police Department, and they were granted summary judgment on their policies and practices claim. When was the first symptom of her DTs? Her first symptoms occurred approximately 6, 630 in the evening. You can see her. She's starting to pace. She's agitated. She's walking back and forth. You can hear her vocalizing. And that's when it started, and it continued up until the time where she... How long can you hear her? When does the audio stop? There's no audio. How can you hear her? Well, you can see her mouth moving on the video. That's what I mean. So, again, you have to add that with what McClanahan says. I just thought it was strange to say you could hear something. I didn't mean to infer that the video had audio. I just meant to say that you can see in the video that she's talking or yelling. So somebody that's in jail that starts to pace and talks to himself, that's a symptom of DTs? Not alone. But if you have someone who tells you, you know she's going to go through alcohol withdrawal or may very well. By 6, 7 o'clock at night, she becomes clammy, sweating. She's pacing. She seems incoherent. She's shaking her hair. You see at points in the video she's teetering. You see her crying, pleading for help, pounding on the window repeatedly. This is the defendant's argument. She's pounding on the window repeatedly. She goes through all of this and their argument is all she wanted to do was just say, please watch me. Does that make any sense? Remember, Judge Rogers, your opinion in the Rome case. You can't decide inferences either at the summary disposition stage. Scott does not extend that far and Plumhoff just reinstated Scott. We don't have just someone pacing. When the district judge says a period of perhaps two hours, what two hours are those? We're talking about numbers now. We're talking about possibly 6.30 all the way through. It's actually longer than two hours, but we have McClanahan. I want to know what two hours this district judge is thinking. I think the district judge is talking about when McClanahan came into the facility after 7 o'clock and for approximately the time. 7 to 9 as well. Yeah, about 7 to 9. That's what I think Judge Fleming is saying. He's basically saying 7 to 9. Correct. But you even have her trying to summon help. If we look at 7 to 9 and there's none of this, then it blatantly contradicts. I think so. But if it doesn't. If it either confirms or doesn't blatantly contradict, then you have probably no jurisdiction. But you have to affirm on the state governmental immunity issues. I just wanted to check and see if I had anything else. I know my time is up. I don't think so. Thank you very much for your time. Thank you. Thank you. A couple of points on rebuttal, Your Honor. First, with respect to the state claims, which I had started to address before my time really, really ran out, I want to say two things. Bennett says that you look to the state law. I think it's important for the court to understand if the court is going to address the state law claims, state law immunity and interlocutory appeal is very broad. One way to determine that there is jurisdiction is to say the claims under the intentional tort claim in particular, which looks at good faith, bad faith, very similar standard to deliberate indifference, if the court is going to address that on the merits, those issues are inextricably intertwined with the issues that are raised in the immunity. Under state law, there is no Johnson v. Jones kind of limitation. The whole issue is before the court. If the court isn't going to look at those, then that's a different story. But if the court looks at those, then it seems to me the court has a broader jurisdiction because the issues are inextricably intertwined. And that's another way in which this court has found jurisdiction on numerous occasions, many of which have been cited, I think, in the various briefs. Secondly, with respect to the timing, what I think is key is that the video blatantly demonstrates that the visible symptoms are not the kind of symptoms that would put these defendants on notice of a need for immediate medical attention. They are symptoms that are maybe not routine in a hotel, but in a jail they are. People pace in cells, people urinate on themselves in cells, people walk around. What about your brother counsel's point that she was not intoxicated? She was at the probation officer. He had a report that she had been seriously intoxicated a week before. He took a second blood alcohol test on the morning. It showed 0.53. 0.53. Oh, yes. She conceded when he asked her, haven't you been drinking, that she had had three vodkas, I think it was, the evening before after 10 o'clock. And so she had been drinking and she still was showing the effects of that blood. How intoxicated. That doesn't say she was intoxicated. How? It said she had been drinking. But she was not intoxicated. I mean, you can have three vodkas the night before and not be intoxicated. I don't think it hurts me because she is an inmate in the jail. She is doing things that inmates in jails do. She's pacing. That's what people do in jail cells. She urinates on herself. People that aren't intoxicated and have a cell all to themselves with a bathroom in it don't normally urinate on themselves. They very well might because of the stress of the situation. And certainly there's no law that I'm aware of that would say that an officer or someone in a jail lockup should know from the mere fact that someone urinates on themselves. No, but that's one symptom that you keep a closer eye on. As the officers did. And there's nothing to refute their testimony that they were looking at the monitor and that they had set their equipment so that they could listen and watch her more carefully than they ordinarily would. So that's undisputed. And the trial court made no finding to say that they weren't checking the monitor. The trial court credited the findings of the other two inmates, we think, in a manner that's completely blatantly contradicted by the video. And the court will have to look at those videos and determine its view of them. I'm afraid you're out of time, Counsel. Thank you. I appreciate the extra. Thank you. Thank you, Your Honor. Thank you. And let me call the next case.